# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ZYNC, INC.,<br><br>Plaintiff,<br><br>v.<br><br>PORSCHE INVESTMENTS MANAGEMENT, S.A., PORSCHE DIGITAL, INC., CHRISTIAN KNÖRLE, and ULRICH THIEM,<br><br>Defendants. | C.A. No. 2025-0284-JTL |

## OPINION DENYING RULE 12(B)(6) MOTIONS

Date Submitted: February 11, 2026
Date Decided: May 29, 2026

Christopher H. Lyons, Jason M. Avellino, ROBBINS GELLER RUDMAN & DOWD LLP, Wilmington, Delaware; Randall J. Baron, Michaela Park, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; *Attorneys for Plaintiff.*

Thomas W. Briggs, Jr., Sara Carnahan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Charles A. DeVore, Carrie M. Stickel, KATTEN MUNCHIN ROSENMAN LLP, Chicago, Illinois; Zoe Lo, KATTEN MUNCHIN ROSENMAN LLP, New York, New York; *Attorneys for Defendants Porsche Investments Management, S.A., Porsche Digital, Inc., Christian Knörle, and Ulrich Thiem.*

**LASTER, V.C.**

The venture capital arm of a luxury automaker funded an automotive technology startup through a convertible note. The startup also executed an investor rights agreement and a voting rights agreement that gave the automaker a board seat and various blocking rights. The voting rights agreement contained a provision that purported to limit the automaker's liability.

The automaker placed one of its employees on the board. Over the next two years, the designee refused to approve transactions unless he received permission from the automaker. The designee also demanded that the startup share confidential information about its dealings with the automaker's competitors before the automaker would consider providing additional financing. The designee's inaction prevented the startup from securing third-party capital, and the automaker never provided more money of its own. The startup had to shut down.

In this action, the startup sued the designee for breach of fiduciary duty. The startup sued the automaker for aiding and abetting its designee's breaches of fiduciary duty, tortious interference with prospective economic advantage, and breach of the implied covenant of good faith and fair dealing inherent in the investor rights agreement.

The automaker and its designee moved to dismiss the complaint for failure to state a claim on which relief can be granted. This decision denies that motion.

## I.     FACTUAL BACKGROUND

The facts are drawn from the complaint, the documents it incorporates by reference, and materials submitted by the parties in connection with their motions.[1] At this procedural stage, the court must credit the complaint's well-pled allegations and draw all reasonable inferences in the plaintiff's favor.

### A.     The Company And The Porsche Note

Before its demise, Zync, Inc. (the "Company") offered a cloud-based platform that provided video streaming, on-demand content, and other experiences for in-vehicle entertainment. Rana Sobhany founded the Company in 2020 and served both as its CEO and as a member of its board of directors (the "Board").

The Company sought a strategic partnership that would provide capital and a path to commercialization. The Company's technology attracted interest from Porsche AG, Mercedes-Benz AG, BMW AG, and other luxury manufacturers.

Porsche has an investment arm that backs technology startups. The entities in the investment arm include Porsche Investments Management S.A. ("Porsche Investments") and Porsche Digital, Inc. ("Porsche Digital").[2] Porsche Investments manages all of Porsche's investments in startups and venture capital funds. Porsche

---

[1] Citations in the form "Compl. ¶ ___" refer to paragraphs of the verified amended complaint, which is the operative pleading. Dkt. 14. Citations in the form "OB Ex. ___ at ___" refer to exhibits defendants filed in support of their motion. Dkt. 20.

[2] Porsche Investments was known as Porsche Investments GmbH before reincorporating in Luxembourg in 2023.

Digital identifies strategic investments for Porsche Investments. Distinguishing among the Porsche entities is not important for purposes of this decision, so unless specificity is warranted, this decision refers to Porsche.

Porsche saw promise in the Company and invested $2.9 million through a convertible note (the "Porsche Note").[3] Porsche also received 305,430 shares of common stock, representing 5% of the Company's equity on a fully-diluted basis.

The parties entered into a voting rights agreement (the "Voting Agreement") under which the Company committed to maintain a three-member board. The Voting Agreement granted Porsche the right to designate one director (the "Porsche Director"). Porche's rights under the Voting Agreement persist as long as Porsche holds at least 2% of the Company's common stock.[4]

The parties also entered into an investor rights agreement (the "Investor Agreement") under which the Company could not take specified actions without the approval of the Porsche Director. The pertinent provision provided that, without the Porsche Director's approval, the Company cannot:

    (a) liquidate, dissolve or wind-up the business and affairs of the Company, effect any merger or consolidation or any other Deemed Liquidation Event, or consent to any of the foregoing;

    (b) amend, alter or repeal any provision of the Certificate of Incorporation or Bylaws of the Company;

---

[3] The complaint alleges that the Porsche Note carried customary conversion rights and preferences. Compl. ¶¶24–26.

[4] *See* OB Ex. 2 ("VA") § 1.2.

3

(c) create, authorize the creation of, or issue any security convertible into or exercisable for any equity security (other than any capital stock issued pursuant to any equity (or equity-linked) compensation plan approved by the Board of Directors);

(d) purchase or redeem (or permit any subsidiary to purchase or redeem) or pay or declare any dividend or make any distribution on, any shares of capital stock of the Company other than repurchases of stock from former employees, officers, directors, consultants or other persons who performed services for the Company or any subsidiary in connection with the cessation of such employment or service at no greater than the original purchase price thereof;

(e) create, or authorize the creation of, or issue, or authorize the issuance of any debt security;

(f) create, or hold capital stock in, any subsidiary that (i) is not wholly owned . . . and (ii) has a board of directors or other governing body . . . that does not permit a Stockholder who has the right to designate one or more directors to the Board of Directors to designate a comparable percentage of directors to [its board], or permit any subsidiary to create, or authorize the creation of, or issue or obligate itself to issue, any shares of any class or series of capital stock, or sell, transfer or otherwise dispose of any capital stock of any director indirect subsidiary of the Company, or permit any direct or indirect subsidiary to sell, lease, transfer, exclusively license or otherwise dispose (in a single transaction or a series of related transactions) of all or substantially all of the assets of such subsidiary; . . .

(g) increase or decrease the authorized number of directors constituting the Board of Directors;

(h) change the compensation of any executive officer or director over €10,000 in any 12-month period, including any option grants or stock awards; or

(i) make any payments or enter into any commercial, lending, or other arrangements with any of the Company's stockholders, officers or directors or any of their Affiliates, except (x) normal payments in accordance with employment agreements with the company; and (y)

4

normal advances for business expenses in the ordinary course of business that do not exceed €10,000.[5]

The agreement also gave Porsche Investments a right of first offer on any issuance of new securities.[6]

Porsche designated Christian Knörle as the Porsche Director. Knörle served as the Head of Company Building at Forward31, a business unit within Porsche Digital. In that role, he reported to Ulrich Thiem, a Managing Director with Porsche Investments.

Throughout the events giving rise to this dispute, Knörle, Sobhany, and Jizong Bruce Chan comprised the Board. Because of the blocking rights in the Voting Agreement, a Board majority comprising Sobhany and Chan could not take action on a covered issue unless Knörle gave his approval.

## B. Porsche Fails To Make Timely Advances Under The Note.

The Porsche Note contemplated five advances to the Company, each at a specified time. The first two were due in September 2020. The third was due in November 2020. The final two were tied to commercialization goals and targeted for March and September 2021. The Porsche Note would mature and repayment would become due in mid-April 2023.[7]

---

[5] *See* OB Ex. 3 ("IA") § 5.4.

[6] *See* IA § 4.1.

[7] *See* OB Ex.1 § 1(p) (defining "Maturity Date" as "the earlier of (i) 18 months from the date on which the Final Principal Payment is funded, and (ii) September 17, 2023."). The final advance was paid in mid-October 2021. *See* Compl. ¶ 33.

5

Porsche began delaying its advances in November 2020. The Company was a startup with limited cash, and the delays jeopardized the Company's stability.

In June 2021, after two delayed advances, Sobhany contacted e&Co. AG (the "Bridge Lender") about a short-term loan. With the Board's unanimous approval, the Company borrowed €350,000 from the Bridge Lender in August (the "Bridge Loan"). Sobhany guaranteed the Bridge Loan personally.

## C. Porsche Exercises Its Veto Rights.

The Company saw the Porsche Note as the initial step in a long-term business relationship. In October 2021, the Company pitched its product to Porsche and received positive feedback. Two months later, however, Porsche declined to move forward, telling the Company that Porsche had "decided to go with another kind of concept."[8]

Although Porsche declined to proceed with the Company's technology, other major automakers remained interested. By late 2021, the Company was negotiating significant contracts. But the prospect of securing those contracts made the Company's capital needs more pressing. Without capital, the Company could not scale its business to meet demand. With Porsche's ardor having cooled, the Company sought alternative sources of financing.

---

[8] Compl. ¶ 35.

### 1.    The VC Financing

In November 2021, a venture capital fund proposed to lead a Series A financing round of $8 million at a pre-money valuation of $32 million (the "VC Financing"). The Company and the fund executed a term sheet dated December 2, 2021. After greater-than-expected investor interest, the fund expanded the round to $10 million at a pre-money valuation of $40 million.

The VC Financing involved issuing Company securities, which required the Porsche Director's approval under the Investor Agreement. Sobhany called Knörle, who told Sobhany he could not approve the deal without Thiem's permission.

Over the next two months, Knörle met with Thiem several times seeking instructions. Meanwhile, the Bridge Lender began pressing the Company for repayment. Sobhany emphasized the urgency of the situation, but Knörle would not act without permission.

In April 2022, Knörle finally agreed to hold a vote on the VC Financing. Knörle delayed the meeting from April 11 to April 12 so he could obtain instructions. When the Board convened, Knörle stated that he would vote against the VC Financing, killing the deal.

### 2.    The Potential For Partner Financing

While Porsche stalled on the VC Financing, two automakers provided potential alternatives. In early March 2022, an American automaker expressed interest in an investment. Later that month, a German automaker expressed interest.

At this same time, the Company had made serious progress toward commercial agreements with other automakers. After a successful pilot program in March 2022,

BMW proposed a deployment. In April, the Company began finalizing terms with Mercedes.

Sobhany shared those developments with the Board. On April 19, 2022. she reported that the Mercedes deal could be signed and announced by May 15.[9] On May 7, she reported that the Company had received a draft contract from Mercedes and a separate term sheet from the American automaker. The following week, Sobhany reported that the Mercedes contract was ready to sign. The agreement was formally executed on June 3 and announced publicly on June 21. The agreement contemplated a per-vehicle licensing fee that the Company projected could produce $40 million in revenue through 2028.

### 3. Porsche Proposes A Bridge Loan.

Shortly after blocking the VC Financing, Knörle suggested that Porsche could offer the Company a bridge loan of $750,000. But on April 26, 2022, after speaking with Thiem, Knörle lowered the amount to "10% of [Porsche's] prior funding"—i.e., $290,000—that would be provided when the Company signed its first commercial agreement.[10] Sobhany told Knörle that the amount was too small to solve the Company's liquidity problems.

During discussions about the bridge loan, Knörle pressed Sobhany for a copy of the draft contract with Mercedes, indicating he would send it to Thiem to "kickstart

---

[9] *Id.* ¶ 48.

[10] *Id.* ¶ 49.

the process" for the bridge financing.[11] Sobhany shared a draft on May 9, underscoring that it was highly confidential. She shared another draft on May 19.[12]

On June 7, 2022, Sobhany told Knörle that the Company had signed the contract with Mercedes and returned a revised term sheet to the American automaker. Sobhany re-emphasized the need for bridge financing.[13] Knörle told Sobhany to send him the competitors' internal data and a copy of the final Mercedes agreement, then the money would follow.[14]

Sobhany complied, but Porsche stalled on the loan. Knörle reported that an internal meeting to discuss the loan had been postponed and that Porsche wanted to partner with the venture arm of the American automaker on the funding.[15]

On June 24, 2022, Porsche reneged on its original offer. Now, Porsche demanded a personal guarantee from Sobhany and an additional Board seat. Sobhany refused.

### 4. The PE Financing

In late June 2022, shortly after the Mercedes announcement, a private equity firm offered to acquire the Company for $50 million. Sobhany contacted Knörle, who

---

[11] *Id.* ¶¶ 50–51.

[12] *Id.*

[13] *Id.* ¶ 53.

[14] *Id.*

[15] *Id.* ¶ 54.

9

refused to provide any feedback until there was a signed term sheet so he could seek approval from Thiem.[16]

Sobhany asked the fund to consider a $4 million loan followed by a $15 million equity investment at a $60 million pre-money valuation. Of the initial loan amount, $3.335 million would be used to buy out Porsche at a premium. The fund expressed willingness to invest $15 million if coupled with a path to a whole company acquisition (the "PE Financing").

Sobhany again sought Knörle's input. Knörle again declined to weigh in, stating that he needed to discuss the idea with Thiem. He told Sobhany that he would not approve the PE Financing without instructions, but that an internal Porsche committee would consider the proposal on August 26, 2022. At the last minute, that committee meeting was postponed.

On August 29, 2022, the Company and the fund executed a term sheet for the PE Financing. Sobhany and Chan approved the deal. Knörle refused to act without instructions.

By mid-September 2022, Knörle still had not acted. Thiem and his team said they would block the deal unless they could speak directly to the fund. In mid-October, Porsche told the fund that Knörle would only be authorized to approve the transaction if the fund indemnified Knörle and Porsche for any damages. The fund refused, and the PE Financing fell through.

---

[16] *Id.* ¶¶ 59–60.

**D.     The Company Shuts Down.**

In August 2022, the Bridge Loan matured. In September, the Bridge Lender sued the Company and Sobhany for the amounts due. A default judgment was ultimately entered against the Company for approximately €244,500.

After the Bridge Lender sued, Porsche instructed Knörle to cut ties with the Company. Knörle resigned effective October 31, 2022.

With Knörle no longer an obstacle, Sobhany tried to revive the PE Financing. The fund declined to proceed, citing the "overhang of Porsche's lack of cooperation and its outstanding contractual rights[.]"[17] Other potential investors also declined to invest, citing Porsche's governance rights. Without the ability to raise capital, the Company effectively shut down.

Sobhany has since learned that the Company's experience was not unique. She believes that Porsche employs a "catch and kill"[18] investment strategy that involves making a seed investment in a startup in return for governance rights, then using the governance rights to block other sources of capital. By making the startup

---

[17] *Id.* ¶ 71.

[18] In journalism, the term "catch and kill" refers to the practice of buying an exclusive story for the explicit purpose of not publishing it. *See, e.g.*, Ronan Farrow, Catch and Kill (2019) (describing the widespread use of this practice to prevent publication of stories about Harvey Weinstein). In the corporate context, a similar phenomenon has been termed the "killer acquisition," where a firm acquires an innovative target to terminate the target's growth and preempt competition. *See generally* Colleen Cunningham, Florian Ederer, & Song Ma, *Killer Acquisitions*, 129 J. Pol. Econ. 649 (2021) (coining the term and presenting empirical data supporting the phenomenon in the pharmaceutical industry).

dependent on Porsche, Porsche gains control of its new and potentially disruptive technology. If Porsche wants to deploy the technology, it can. If not, Porsche can force the startup to shut down, while maintaining control over its intellectual property. The complaint cites exchanges between Sobhany and other founders or executives that support this theory. Knörle acknowledged the pattern.[19]

## E. This Litigation

In March 2025, the Company filed suit. The operative complaint contains four counts.

Count I asserts that Knörle breached his fiduciary duties by acting to harm the Company and for the benefit of Porsche.

Count II asserts that Thiem, Porsche Investments, and Porsche Digital aided and abetted Knörle's breaches of fiduciary duty.

Count III claims that Thiem, Porsche Investments, and Porsche Digital tortiously interfered with the VC Financing and PE Financing.

Count IV claims that Porsche Investments' use of the Porsche Director's approval rights to block transactions violated the implied covenant of good faith and fair dealing in the Investor Agreement.

The defendants moved to dismiss the operative complaint for failing to state a claim on which relief can be granted. Thiem moved for dismissal, contending that the

---

[19] *Id.* ¶¶ 74–75.

12

court cannot exercise personal jurisdiction over him. In a separate decision, the court granted Thiem's motion.[20] This decision addresses Knörle and Porsche's motions.

## II. LEGAL ANALYSIS

A motion under Rule 12(b)(6) asserts that a complaint fails to state a claim on which relief can be granted.[21] When evaluating a Rule 12(b)(6) motion, "a trial court should accept all well-pleaded factual allegations in the Complaint as true" and "draw all reasonable inferences in favor of the plaintiff."[22] The court should "deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[23] The "conceivability" standard "is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'"[24]

Under a notice pleading standard, a court should "accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim."[25] "[T]he trial court is not required to accept every strained interpretation

---

[20] *See Zync, Inc. v. Porsche Invs. Mgmt., S.A.*, 2026 WL 1470324 (Del. Ch. May 26, 2026).

[21] *See* Ct. Ch. R. 12(b)(6).

[22] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[23] *Id.*

[24] *Id.* at 537 n.13.

[25] *Id.*

13

of the allegations proposed by the plaintiff," but only "reasonable inferences that logically flow from the face of the complaint."[26]

## A. Count I: The Claim For Breach Of Fiduciary Duty Against Knörle

The complaint asserts that Knörle breached his fiduciary duties as a director through a course of conduct that included failing to approve the VC Financing, failing to approve the PE Financing, and extracting confidential information from the Company to share with Porsche. The Company contends that Knörle acted disloyally and in bad faith by favoring Porsche's interests over the Company's. This theory states a claim on which relief can be granted.

A plaintiff can sufficiently allege that a director acted disloyally in three primary ways:

1. By pleading facts showing that the director received "a personal financial benefit from a transaction that is not equally shared by the stockholders,"[27]

---

[26] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001); *accord Page v. Oath Inc.,* 270 A.3d 833, 842 (Del. 2022); *Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine P'rs 2006, L.P.*, 93 A.3d 1203, 1205 (Del. 2014); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006); *see Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013) ("We do not, however, credit conclusory allegations that are not supported by specific facts, or draw unreasonable inferences in the plaintiff's favor.").

[27] *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993), *overruled in part on other grounds by United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034 (Del. 2021); *accord Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993) ("Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally."), *modified on other grounds*, 636 A.2d 956 (Del. 1994); *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984) ("Directorial interest exists

14

2.  By pleading facts showing the director is sufficiently loyal to, beholden to, or otherwise influenced by an interested party to undermine the director's ability to judge the matter on its merits,[28] or

whenever . . . a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders."), *overruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). "[A] subjective 'actual person' standard [is used] to determine whether a 'given' director was likely to be affected in the same or similar circumstances." *McMullin v. Beran*, 765 A.2d 910, 923 (Del. 2000) (quoting *Cinerama, Inc. v. Technicolor, Inc. (Technicolor Plenary IV)*, 663 A.2d 1156, 1167 (Del. 1995)). "[T]he benefit received by the director must be 'of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties . . . without being influenced by her overriding personal interest.'" *In re Trados Inc. S'holder Litig. (Trados I)*, 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009) (quoting *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999)).

[28] *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984) (stating that one way to allege successfully that an individual director is under the control of another is by pleading "such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person"), *overruled in part on other grounds by Brehm*, 746 A.2d 244; *see also Friedman v. Beningson*, 1995 WL 716762, at *4 (Del. Ch. Dec. 4, 1995) ("The requirement that directors exercise *independent judgment, (insofar as it is a distinct prerequisite to business judgment review from a requirement that directors exercise financially disinterested judgment)*, directs a court to an inquiry into all of the circumstances that are alleged to have inappropriately affected the exercise of board power. This inquiry may include the subject whether some or all directors are 'beholden' to or under the control, domination or strong influence of a party with a material financial interest in the transaction under attack, which interest is adverse to that of the corporation."). Classic examples involve familial relationships, such as a parent's love for and loyalty to a child. *See, e.g.*, *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999) ("That Hudson also happens to be Huizenga's brother-in-law makes me incredulous about Hudson's impartiality. Close familial relationships between directors can create a reasonable doubt as to impartiality. The plaintiff bears no burden to plead facts demonstrating that directors who are closely related have no history of discord or enmity that renders the natural inference of mutual loyalty and affection unreasonable." (footnote omitted)); *Chaffin v. GNI Gp. Inc.*, 1999 WL 721569, at *5 (Del. Ch. Sept. 3, 1999) (holding father-son relationship was sufficient to rebut presumption of independence, stating "[i]nherent in the parental relationship is the parent's natural desire to help his or her child succeed . . . . [M]ost parents would find

15

3. By pleading facts supporting an inference that the director failed to act in good faith.[29]

A common variant of the second option involves alleging that the director was a dual fiduciary and owed a competing duty of loyalty to a person or entity with a conflict of interest of its own.[30]

The complaint pleads that Knörle was a conflicted dual fiduciary. He also inferably acted in bad faith.

### 1. The Dual-Fiduciary Problem

Knörle faced the dual fiduciary problem when making decisions for the Company that Porsche wanted him to oppose. In *Weinberger*, the Delaware Supreme

---

it highly difficult, if not impossible, to maintain a completely neutral, disinterested position on an issue, where his or her own child would benefit substantially if the parent decides the issue a certain way."); *see also London v. Tyrrell*, 2010 WL 877528, at *14 n.60 (Del. Ch. Mar. 11, 2010) ("[I]n the pre-suit demand context, plaintiffs can often meet their burden of establishing a lack of independence with a simple allegation of a familial relationship. Surely then . . . it will be nigh unto impossible for a corporation bearing the burden of proof to demonstrate that an SLC member is independent in the face of plaintiffs' allegation that the SLC member and a director defendant have a family relationship.").

[29] *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *1 (Del. Ch. May 20, 2016) ("Good faith—the absence of actions taken in bad faith—prohibits board action intended for purposes other than corporate weal, even though taken by independent, disinterested directors.").

[30] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 710–11 (Del. 1983) (holding that officers of parent corporation faced conflict of interest when acting as subsidiary directors regarding transaction with parent); *accord Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1336–38 (Del. Ch. 1987) (same); *see also Trados I*, 2009 WL 2225958, at *8 (treating directors as interested for pleading purposes in transaction that benefited preferred stockholders when "each had an ownership or employment relationship with an entity that owned Trados preferred stock").

16

Court explained that "[t]here is no dilution of [fiduciary] obligation where one holds dual or multiple directorships."[31] If the interests of the beneficiaries to whom the dual fiduciary owes duties are aligned, then there is no conflict of interest.[32] But if the interests of the beneficiaries diverge, the fiduciary faces an inherent conflict of interest.[33]

---

[31] *Weinberger,* 457 A.2d at 710.

[32] *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 186 (Del. Ch. 2014); *see, e.g.*, *Van de Walle v. Unimation, Inc.,* 1991 WL 29303, at *11 (Del. Ch. Mar. 7, 1991).

[33] *In re Trados Inc. S'holder Litig. (Trados II)*, 73 A.3d 17, 46–47 (Del. Ch. 2013) (citation omitted); *see Metro Storage Int'l LLC v. Harron*, 2019 WL 3282613, at *23 (Del. Ch. July 19, 2019) ("[P]ersons frequently make decisions on behalf of one entity while simultaneously owing fiduciary duties to a different entity, whether as agents or otherwise. To the extent the competing duties conflict, the dual fiduciary does not lose the ability to exercise managerial authority. The conflicted dual fiduciary instead faces heightened liability risk."); *see also Krasner v. Moffett*, 826 A.2d 277, 283 (Del. 2003) ("[T]hree of the FSC directors . . . were interested in the MEC transaction because they served on the boards . . . of both MOXY and FSC."); *McMullin*, 765 A.2d at 923 ("The ARCO officers and designees on Chemical's board owed Chemical's minority shareholders 'an uncompromising duty of loyalty.' There is no dilution of that obligation in a parent subsidiary context for the individuals who acted in a dual capacity as officers or designees of ARCO and as directors of Chemical." (citation omitted) (internal quotation marks omitted)); *Rabkin v. Philip A. Hunt Corp.*, 498 A.2d 1099, 1106 (Del. 1985) (holding that parent corporation's directors on subsidiary board faced conflict of interest because "individuals who act in a dual capacity as directors of two corporations . . . owe the same duty of good management to both corporations" (citation omitted)); *Weinberger*, 457 A.2d at 710 (holding that officers of parent corporation faced conflict of interest when acting as subsidiary directors regarding transaction with parent); *see also Rales*, 634 A.2d at 933 (explaining for purposes of demand futility that "'[d]irectorial interest exists whenever divided loyalties are present'" (quoting *Pogostin*, 480 A.2d at 624)); *Goldman v. Pogo.com, Inc.*, 2002 WL 1358760, at *3 (Del. Ch. June 14, 2002) ("Because Khosla and Wu were the representatives of shareholders which, in their institutional capacities, are both alleged to have had a direct financial interest in this

17

As a Company director, Knörle owed fiduciary duties to the Company and its stockholders.[34] As Porshe's employee, Knörle owed fiduciary duties to Porsche.[35] It is therefore reasonably conceivable that Knörle faced a conflict of interest when Porsche instructed him to withhold consent for the VC Financing and the PE Financing. It is reasonably conceivable that both transactions were in the Company's best interests, yet Knörle withheld his approval because Porsche would not authorize them. It is

---

transaction, a reasonable doubt is raised as to Khosla and Wu's disinterestedness in having voted to approve the . . . [l]oan."); *Sealy*, 532 A.2d at 1336–37 (similar).

[34] *McRitchie v. Zuckerberg*, 315 A.3d 518, 526 (Del. Ch. 2024).

[35] An employee is an agent. Restatement (Third) of Agency § 7.07(3)(a) (A.L.I. 2006), Westlaw (database updated Oct. 2024); *see* Restatement (Second) of Agency § 2 (A.L.I. 1958), Westlaw (database updated Oct. 2024) ("A servant is an agent employed by a master . . . ."); Matthew T. Bodie, *Employment as Fiduciary Relationship*, 105 Geo. L.J. 819, 820 (2017) ("The hoary 'master–servant' doctrine holds that employees are agents of their employers and owe the traditional fiduciary duties of loyalty and performance."). An agent is a fiduciary. *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 843 (Del. Ch. 2022); Restatement (Third) of Agency, *supra*, § 1.01 ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."); *id.* § 8.01 ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."); *see Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980) ("It is true, of course, that under elemental principles of agency law, an agent owes his principal a duty of good faith, loyalty and fair dealing."); Barak Orbach, *D&O Liability for Antitrust Violations*, 59 Santa Clara L. Rev. 527, 528 n.2 (2020) ("All agents are fiduciaries but not all fiduciaries are agents."); Thomas Earl Geu, *A Selective Overview of Agency, Good Faith and Delaware Entity Law*, 10 Del. L. Rev. 17, 20 (2008) (explaining that fiduciary status is "a result of agency" and collecting authorities establishing the point); Ramon Casadesus-Masanell & Daniel F. Spulber, *Trust and Incentives in Agency*, 15 S. Cal. Interdisc. L.J. 45, 68 (2005) ("While all agents are fiduciaries, not all fiduciaries are agents.").

reasonably conceivable that in making that decision, Knörle acted to pursue Porsche's interests rather than the Company's.

It is likewise reasonably conceivable that Knörle faced a conflict of interest when insisting that Sobhany share competitors' confidential information with Porsche, including drafts of the agreement with Mercedes. It is reasonably conceivable that sharing that information with Porsche harmed the Company, rather than advancing its best interests. It is reasonably conceivable that Porsche wanted that information for its own purposes, rather than to pursue the best interests of the Company. By going along with Porsche's instructions to obtain the information, Knörle inferably acted disloyally.

To defeat the dual-fiduciary problem, Porsche contends that it could not conceivably have a conflict of interest with the Company because it backed the Company as a noteholder and owned shares of the Company as a stockholder. Porsche argues that it would have been irrational to harm the Company because that would impair the value of its common shares and reduce the likelihood of repayment on the Porsche Note. "Delaware law presumes that investors act to maximize the value of their own investments."[36] When directors or their affiliates own "material amounts"

---

[36] *Katell v. Morgan Stanley Gp., Inc.*, 1995 WL 376952, at *12 (Del. Ch. June 15, 1995) (citing *Unitrin, Inc. v. American Gen. Corp.*, 651 A.2d 1361, 1380–81 (Del. 1995)).

19

of common stock, those holdings generally align their interests with other stockholders and the best interests of the corporation as a whole.[37]

But there are exceptions to any general rule. Circumstances may cause the interests of a director and its affiliated investor to diverge from the interests of corporation and its stockholders as a whole. For example, "particular types of investors may espouse short-term investment strategies and structure their affairs to benefit economically from those strategies, thereby creating a divergent interest in pursuing short-term performance at the expense of long-term wealth."[38] A desire for liquidity may also cause an investor and its affiliated director to face a conflict.[39]

It is far from clear that the amounts Porsche invested in the Company were material to Porsche. In any event, the complaint pleads that Porsche had incentives of its own that caused its interests to diverge from those of the Company and its stockholders. The complaint sufficiently alleges that Porsche and other automakers compete to access new technologies, particularly those potentially attractive to buyers of luxury automobiles. The complaint sufficiently alleges that the Company's

---

[37] *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *41 (Del. Ch. Oct. 16, 2018) (cleaned up).

[38] *Id.*

[39] *See generally Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 255–57 (Del. Ch. 2021) (collecting and summarizing authorities on liquidity-driven conflicts).

technology fell into that category. The complaint sufficiently alleges that Porsche could secure a comparative advantage in the automotive market by gaining access to an alternative technology while preventing its competitors from accessing that technology. It is reasonable to infer that this strategy could benefit Porsche far more than any harm it would suffer from writing off its comparatively small investment in the Company.

The complaint's timeline supports this inference. Porsche initially backed the Company's technology, then informed the Company that it was pursuing a different option. After that point, Porsche learned that its competitors were showing interest in the Company's technology. It is reasonably conceivable that Porsche saw a benefit in preventing key competitors—including Mercedes and BMW—from securing a competitive offering. At a minimum, Porsche could delay its competitors' access to the Company's technology.

Porsche inferably sacrificed its investment in the Company to achieve broader competitive gains. Chess players make sacrifices all the time. A particular sacrifice may not work, but no one thinks all sacrifices are irrational. The Porsche Note and Porsche's equity position do not defeat a pleading-stage inference of self-interested conduct.

### 2. Action Not In Good Faith

The complaint separately pleads facts sufficient to support an inference that Knörle failed to act in good faith because he consciously pursued Porsche's objectives rather than the best interests of the Company.

A director fails to act in good faith when "the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation."[40] A plaintiff can call into question a director's good faith by pleading facts supporting an inference that the director acted for some other purpose.[41] "Bad faith can be the result of "any human emotion [that] may cause a director to [intentionally] place his own interests, preferences or appetites before the welfare of the corporation," including greed, "hatred, lust, envy, revenge, . . . shame or pride."[42] A director can also act in bad faith by engaging in an "intentional dereliction of duty" such as by showing a "conscious disregard for one's responsibilities."[43]

The standard for bad faith is *not* whether the action taken is "so beyond the bounds of reasonable judgment that it seems essentially inexplicable on any other ground."[44] The Delaware Supreme Court rejected that standard in *Kahn v. Stern*,

---

[40] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006).

[41] *Id.* at 53 (noting that Delaware law "clearly permits a judicial assessment of director good faith" at the pleading stage); *accord eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 40 (Del. Ch. 2010).

[42] *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.); *see Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) ("The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless.").

[43] *Disney*, 906 A.2d at 66; *accord Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009).

[44] *Leung v. Schuler*, 2000 WL 1478538, at *6 (Del. Ch. Oct. 2, 2000), *aff'd*, 783 A.2d 124 (Del. 2001) (TABLE), *abrogated by Brinckerhoff v. Enbridge Energy Co.*,

22

where the justices considered an appeal from a decision that declined to draw a pleading-stage inference that directors had acted in bad faith.[45] While agreeing with the result, Chief Justice Strine went out of his way to state that

> to the extent that the Court of Chancery's decision might be read as suggesting that a plaintiff in this context must plead facts that rule out any possibility other than bad faith, rather than just pleading facts that support a rational inference of bad faith, we disagree with that statement.[46]

In support, he cited *Brinckerhoff*, a 2017 Delaware Supreme Court decision that overruled an earlier precedent in which the justices had used the standard of "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[47] The *Brinckerhoff* decision held that to plead action not in good faith, a plaintiff need only plead facts supporting an inference that the defendant did not reasonably believe that the transaction was in the best interests of the entity or its equity holders.[48]

---

*Inc.*, 159 A.3d 242, 258–60 (Del. 2017), *and Kahn v. Stern*, 183 A.3d 715, 715 (Del. 2018) (TABLE).

[45] *Kahn*, 183 A.3d at 715 (explaining that a plaintiff need not "plead facts that rule out any possibility other than bad faith").

[46] *Id.*

[47] *Id.* at 715 n.5 (citing *Brinckerhoff*, 159 A.3d at 258–60).

[48] *Brinckerhoff*, 159 A.3d at 258–60.

To be sure, showing that conduct is "inexplicable on any ground other than bad faith" remains one means of establishing bad faith, but a plaintiff need not plead facts meeting that standard to survive a motion to dismiss.[49]

Likewise, allegations of bad faith do not require a smoking gun.

> Rarely will direct evidence of bad faith—admissions or evidence of conspiracy—be available. Moreover, due regard for the protective nature of the stockholders' class action, requires the court, in these cases, to be suspicious, to exercise such powers as it may possess to look imaginatively beneath the surface of events, which, in most instances, will itself be well-crafted and unobjectionable.[50]

Chancellor Allen made these observations when ruling on a preliminary injunction application, after the plaintiff had the opportunity to conduct discovery and take depositions. Even at trial, a plaintiff need not rule out other explanations; the plaintiff need only show by a preponderance of the evidence that the fiduciary acted for a purpose other than the best interest of the corporation.[51]

At the pleading stage, Chancellor Allen's admonition carries even greater weight because neither a plaintiff nor members of the Court of Chancery can "peer into the hearts and souls of directors to determine their subjective intent with

---

[49] *Kahn*, 183 A.3d at 715.

[50] *In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147, at *12 (Del. Ch. Aug. 8, 1988).

[51] *See Brinckerhoff*, 159 A.3d at 259–60.

24

certainty."[52] "Without the ability to read minds, a trial judge only can infer a party's subjective intent from external indications."[53]

> While "mind reading" might sound like a mentalist magic trick, for cognitive scientists it refers to the very pedestrian capacity we all have for figuring out what another human being is thinking . . . . Other people's minds are opaque to us, so we cannot observe them directly. And yet, when someone walks toward the water fountain on a hot day, we know she wants a drink. When someone yelps after stubbing her toe, we know she feels pain. When someone aims an arrow at a target, we know she intends to hit it. We take in observable data about a person and infer something about her unobservable mental life.[54]

Stated plainly, "[t]o get at a person's unobservable mental state, we look at what the person did and the circumstances in which they did it."[55]

Under Rule 9(b), a plaintiff can plead intent generally.[56] That means that the complaint's factual allegations, when viewed holistically, must support a reasonable

---

[52] *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 106 (Del. 2013).

[53] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 178 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE).

[54] Mihailis E. Diamantis, *How to Read a Corporation's Mind*, *in The Culpable Corporate Mind* 222–23 (Elise Bant ed., 2023).

[55] *Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Found. Bldg. Mat'ls, Inc.*, 318 A.3d 1105, 1164 (Del. Ch. 2024). ("Although lawyers routinely object that witnesses cannot speculate about someone else's state of mind, there is actually nothing special about it.").

[56] Ct. Ch. R. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

inference that the person could have acted for a purpose other than the best interest of the corporation.[57]

Here, the complaint alleges that Knörle deferred to Porsche time and again. When asked to support the VC Financing, Knörle refused to take action without Porsche's signoff. Then he dragged out the process for a formal vote by months before declining to support the transaction. When asked to support the PE Financing, Knörle ran a similar play. He would not take action without Porsche's signoff and slow-rolled the process. He eventually insisted that Porsche speak directly to the PE Fund, at which point Porsche demanded terms that killed the deal. Similarly, as the Bridge Lender pressed for repayment, Knörle demanded confidential information from the Company, claiming that bridge financing from Porsche would follow. Yet after extracting the competitive information, Porsche reneged on its earlier promise of bridge funding by adding new terms. Knörle was inferably part of the bait-and-switch.

After Porsche failed to provide or approve funding, the Company defaulted on the Bridge Loan. At that point, the Bridge Lender sued, and Knörle abandoned his post. Initially, he followed Porsche's instruction not to engage with his fellow directors. Later, he resigned from the Board.

---

[57] "Even after a trial, a judge may need to make credibility determinations about a defendant's subjective beliefs by weighing witness testimony against objective facts." *Encore Energy P'rs*, 72 A.3d at 106. And even then, the "[o]bjective facts remain logically and legally relevant to the extent they permit an inference that a defendant lacked the necessary subjective belief." *El Paso*, 113 A.3d at 178.

Knörle argues that he acted in good faith to pursue the Company's best interests. As support, he cites his vote for the Bridge Loan. But that loan did not pit Porsche's interests against the Company's. Porsche had made its financial commitments to the Company and inferably did not want to put in more money itself. If anything, Porsche seemed reluctant to fulfill its existing financial commitment to the Company, because Porsche had been delaying its advances under the Porsche Note. Porsche did not guarantee the Bridge Loan; Sobhany did. Nor is it clear that Knörle could have blocked the Bridge Loan.[58] The Investment Agreement required Knörle's approval for issuing a "debt security," but the Bridge Loan was not a security. Without a blocking right, Knörle's opposition would have meant little; the other two directors could have approved it without him.

Approving the Bridge Loan thus looks like an instance where Knörle went along with what would have happened anyway. That is not a beneficent act. At any rate, the Company is not claiming that Knörle breached his duties when approving the Bridge Loan. A director need not breach his fiduciary duties at every turn to commit an actionable breach of duty.

In an effort to absolve Knörle of responsibility, the defendants argue that he could not have breached his duties because neither the VC Financing nor the PE Financing were formally put to a vote. Equity is not so blind. It regards the substance

---

[58] *See* IA § 5.4.

rather than the form.[59] Directors can breach their duties through informal action and conscious inaction.[60] Knörle breached his duty of loyalty by consciously preventing the Board from taking action.

*Shocking Technologies* illustrates the point.[61] There, a startup teetering on the brink of insolvency identified a potential investor. To further his own agenda, a

---

[59] *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983); *accord* 2 Pomeroy's Equity Jurisprudence § 378 (1941) ("[I]t is only by looking at the intent rather than at the form, that equity is able to treat that as done which in good conscience ought to be done.").

[60] *See, e.g., Aronson*, 473 A.2d at 813 ("[A] conscious decision to refrain from acting may nonetheless be a valid exercise of business judgment and enjoy the protections of the rule."); *see also Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014) ("The Complaint alleges that the Board had the ability to defer interest payments on the Junior Notes, that the Junior Notes would not receive anything in an orderly liquidation, that [Defendant] owned all of the Junior Notes, and that the Board decided not to defer paying interest on the Junior Notes to benefit [Defendant] . . . . A decision to act and a conscious decision not to act are . . . equally subject to review under traditional fiduciary duty principles."); *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *23 (Del. Ch. May 21, 2013) ("The Special Committee decided not to take any action with respect to the Audit Committee's termination of two successive outside auditors and the allegations made by Ernst & Young. The conscious decision not to take action was itself a decision."); *Krieger v. Wesco Fin. Corp.*, 30 A.3d 54, 58 (Del. Ch. 2011) ("Wesco stockholders had a choice: they could make an election and select a form of consideration, or they could choose not to make an election and accept the default cash consideration."); *Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *10 (Del. Ch. Jan. 14, 1991) ("[T]he case-by-case development of the law governing fiduciary obligations . . . cannot be constrained by so facile a distinction. From a semantic and even legal viewpoint, 'inaction' and 'action' may be substantive equivalents, different only in form.").

[61] *Shocking Techs., Inc. v. Michael*, 2012 WL 4482838 (Del. Ch. Oct. 1, 2012), *vacated*, 2015 WL 3455210 (Del. Ch. May 29, 2015). Though the decision was ultimately vacated, the underlying principle for which the case is cited "remains viable." *OptimisCorp v. Waite*, 2015 WL 5147038, at *73 n.582 (Del. Ch. Aug. 26, 2015).

director secretly told the potential investor that it had no competition, and encouraged the investor to string out the negotiations and demand more favorable terms.[62] The court held that, even assuming the director believed his own agenda was best for the startup, "the most logical objective of [the director's] actions—strangling the Company with a potentially catastrophic cash shortfall—cannot be reconciled with his 'unremitting' duty of loyalty."[63] Formal board action is not required for breach.

## B.    Count II: The Aiding And Abetting Claim Against Porsche

The complaint next alleges that Porsche aided and abetted Knörle's breaches of fiduciary duty by instructing him to act in Porsche's interests and against the Company's interests. That theory states a claim on which relief can be granted.

"A claim for aiding and abetting has four elements: (1) the existence of a fiduciary relationship, (2) a breach of fiduciary duty, (3) knowing participation in that breach, and (4) damages proximately caused by the breach."[64] The well-pled claim against Knörle for breach of the duty of loyalty satisfies the first two elements. A

---

[62] *Id.* at *6 ("In sum, Michael attempted to keep Littelfuse from exercising the warrants in accordance with their terms and to persuade Littelfuse to negotiate an even better deal—whether in terms of price or in terms of an additional board seat—before it exercised the warrants or made additional investments in Shocking.").

[63] *Id.*

[64] *In re Engagesmart, Inc. S'holder Litig.*, — A.3d —, 2026 WL 554442, at *35 (Del. Ch. Feb. 27, 2026) (citing *Malpiede*, 780 A.2d at 1096).

plaintiff can plead damages generally, and with the Company rendered insolvent, the fourth element is inferably satisfied as well.

Whether the Complaint states a claim therefore turns on third element: knowing participation. That element "involves two concepts: knowledge and participation."[65]

The knowledge concept has two dimensions of its own.[66] First, the secondary actor must know that the primary wrongdoer's conduct constituted a breach of duty.[67] Second, the secondary actor must know that its own participation in the wrongful conduct was legally improper, though it need not be wrongful or tortious in its own right.[68]

---

[65] *Presidio*, 251 A.3d at 275 (Del. Ch. 2021).

[66] *RBC Cap. Mkts. LLC v. Jervis*, 129 A.3d 816, 861–62 (Del. 2015).

[67] *Id.*; *accord Malpiede*, 780 A.2d at 1097 ("Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach.").

[68] *RBC Cap. Mkts.*, 129 A.3d at 862; *see also New Enter. Assocs. 14, L.P. v. Rich* (*NEA I*), 292 A.3d 112, 176 (Del. Ch. 2023) ("The aider and abettor must knowingly assist another in committing a wrongful act. The means by which an aider and abettor provides assistance need not be independently wrongful."); *e.g.*, *Found. Bldg. Mat'ls, Inc.*, 318 A.3d at 1171 ("The plaintiff has not pled that RBC took action that was independently wrongful, but that is not required . . . . RBC worked closely with the Lone Star-affiliated directors to secure proposals that included a maximum Early Termination Payment. RBC played an integral part in the effort to sell the Company through a transaction that would trigger the Early Termination Payment. The complaint states a claim against RBC for aiding and abetting that alleged breach.").

Until 2025, constructive knowledge was enough.[69] In *Columbia Pipeline*, the Delaware Supreme Court overruled prior law and held that the aider and abettor's knowledge "must be actual knowledge."[70] At the pleading stage, however, a complaint need only plead facts supporting a reasonable inference of knowledge.[71]

The participation concept requires that the secondary actor provided "substantial assistance" to the primary violator.[72] To evaluate substantial assistance, Delaware law applies a five-factor test derived from the *Restatement (Second) of Torts*.[73] "That framework calls for considering (1) the nature of the act encouraged,

---

[69] *RBC Cap. Mkts.*, 129 A.3d at 862 ("To establish scienter, the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper." (internal quotation marks omitted)); *id.* (explaining that the aider and abettor must act "knowingly, intentionally, or with reckless indifference" (cleaned up)).

[70] *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 342 A.3d 324, 368 (Del. 2025). The justices defined "actual knowledge" as "'clear and direct knowledge.'" *Id.* at 356 & n.194 (quoting *Deutsche Bank Nat'l Tr. Co. v. Goldfeder*, 86 A.3d 1118 (Del. 2014) (TABLE) ("Actual knowledge is defined as direct and clear knowledge. Constructive knowledge is defined as knowledge that one using reasonable care and diligence should have, and therefore that is attributed by law to a given person." (cleaned up)).

[71] *See Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *17 (Del. Ch. June 30, 2014). Under Rule 9(b), a plaintiff can plead knowledge generally. Ch. Ct. R. 9(b).

[72] *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *41 (Del. Ch. Aug. 27, 2015).

[73] Restatement (Second) of Torts § 876 (Am. L. Inst. 1979), Westlaw (database updated Sept. 2025).

(2) the amount of assistance given by the defendant, (3) his presence or absence at the time of the tort, (4) his relation to the other, and (5) his state of mind."[74]

The Delaware Supreme Court has recently heightened the pleading requirement for substantial assistance, at least for third-party acquirers. Under *Columbia Pipeline* and *Mindbody*, a plaintiff must now plead that the secondary actor engaged in affirmative conduct when pursuing an aiding and abetting claim against a third-party acquirer.[75] In both decisions, a buyer covenanted to supply accurate information for inclusion in the seller's proxy statement and to correct any material misstatements or omissions. In each case, the buyer knew of material omissions but remained silent.[76] The Delaware Supreme Court rejected the argument that a conscious failure to act in the face of a known duty to act amounted to knowing participation. The justices reasoned that concluding otherwise would convert "contractual disclosure-based obligations between a third-party buyer and a target company" into "independent fiduciary duties between the third-party buyer and the target's stockholders" (even though liability for aiding and abetting is distinct from

---

[74] *Engagesmart,* 2026 WL 554442, at \*35 (citing *Dole,* 2015 WL 5052214 at \*42); *accord In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 395–96 (Del. 2024).

[75] *Mindbody*, 332 A.3d at 403 & n.137 (holding that a failure to act is insufficient absent an independent duty between the alleged aider and abettor and the plaintiff)*; Columbia Pipeline*, 342 A.3d at 369 (discussing and adopting the "affirmative action" requirement in *Mindbody*).

[76] *See Mindbody*, 332 A.3d at 375; *Columbia Pipeline*, 342 A.3d at 368.

owing "independent fiduciary duties").[77] The justices felt that outcome would "collapse the arms'-length distance" between the buyer and seller so that the buyer would have to consider the completeness of the disclosures made to the target's stockholders (seemingly what the contract explicitly called for), instead of solely considering the interests of its own stockholders.[78] The justices also worried the buyer would have to second-guess the disclosure determinations of the target's board (again seemingly what the contract explicitly called for).[79]

It is unclear how the active-participation concept applies to aiders and abettors other than third-party acquirers. In both *Columbia Pipeline* and *Mindbody*, the Delaware Supreme Court relied heavily on the arms'-length nature of the relationship between an acquirer and a target.[80] Other aiders and abettors are differently situated. The multi-factor approach modeled on the *Restatement (Second) of Torts* may continue to permit aiding and abetting claims in those settings without the type of active-participation requirement that *Columbia Pipeline* and *Mindbody* imposed.[81]

---

[77] *Mindbody*, 332 A.3d at 404.

[78] *Id.*

[79] *Id.*

[80] *See Engagesmart*, 2026 WL 554442, at \*36 (discussing decisions).

[81] *E.g.*, *Elec. Last Mile Sols., Inc. S'holder Litig.*, 2026 WL 207195, at \*8 (Del. Ch. Jan. 27, 2026).

An affiliate of an allegedly culpable fiduciary is different situated than a third-party acquirer.[82] The claim here is simply that Porsche caused Knörle to breach his fiduciary duties. Porsche knowingly participated because Knörle acted on Porsche's instructions.

Spinning out the theory, Porsche knew that the Company was desperate for cash. Porsche knew that without explicit direction, Knörle would not approve the VC Financing or PE Financing. Porsche also knew that either transaction could alleviate the Company's financial distress and enable the Company to launch its product with Porsche's competitors. To gain an advantage over its competitors, Porsche instructed Knörle not to approve the VC Financing or the PE Financing. Knörle likewise

---

[82] *See, e.g.*, *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 818 (Del. Ch. 2022) (inferring at pleading stage that affiliate of interested controller who acted as financial advisor for transaction aided and abetted breach of duty by controller); *La. Mun. Police Empls.' Ret. Sys. v. Fertita*, 2009 WL 2263406, at *7 n.27 (Del. Ch. July 28, 2009) (inferring at pleading stage that affiliated entities that controller used to effectuate an interested transaction knowingly participated in the breach and were subject to viable claim for aiding and abetting); *see also Dole*, 2015 WL 5052214, at *39 (holding after trial that affiliated entities that controller used to effectuate an unfair transaction knowingly participated in the breach of duty and were jointly and severally liable with controller for aiding and abetting the breach); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *38 (Del. Ch. May 3, 2004) (same); *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *15–16 (Del. Ch. Nov. 21, 1995) (Allen, C.) (denying a motion to dismiss aiding and abetting claims against controlling stockholder and his affiliates where the complaint alleged "overarching control" by the stockholder such that the court could "infer[] 'knowing' participation" by his affiliates).

inferably knew all of this, and his knowledge is also imputed to Porsche as Porsche's employee.[83] Those pled facts support both knowledge and participation.

Porsche and Knörle's actions involving the second bridge loan provide further evidence that they consciously worked together. The complaint's allegations support an inference that Porsche never intended to provide more capital. Porsche used the lure of the loan to extract confidential information from the Company for its own competitive advantage. Knörle was the tool Porsche used to carry out its plans.

Porsche argues that a director talking or consulting with a major stockholder, even an affiliate, does not give rise to aiding and abetting liability. True,[84] and inferably *not* what happened here. Porsche told Knörle what to do, and he did it despite inferably knowing that he was acting to the Company's detriment. That is knowing participation.

---

[83] *Thornton v. Lamborn*, 2024 WL 326665, at *4 (Del. Ch. Jan. 29, 2024) ("[A]cts of agents are, generally, imputed to and binding upon their principals. A principal cannot disclaim responsibility to perform under a contractual agreement by authorizing an agent to act on his behalf; the contractual duty remains with the principal."); *see also Falcon Steel Co., Inc. v. Md. Cas. Co.*, 366 A.2d 512, 515 (Del. Super. 1976) ("A person cannot avoid the consequences of action or inaction merely because he delegated the matter to an employee.").

[84] *E.g.*, *DSM HoldCo, Inc. v. Demoulas*, 2026 WL 1053100, at *2 (Del. Ch. Apr. 20, 2026) (noting that the directors "consulted with the [stockholders who elected them], took their concerns into account, and considered the stockholder-level disputes between the sisters and the CEO, but directors can legitimately do that").

Count II therefore states a claim against Porsche for aiding and abetting Knörle's breaches of duty.

## C. Count III: The Claim For Intentional Interference With Prospective Economic Advantage Against Porsche

The complaint next asserts that Porsche intentionally interfered with the Company's prospective economic advantage by blocking the VC Financing and PE Financing. This count also states a claim on which relief could be granted.

A claim for intentional interference with contract or with prospective economic advantage is an intentional tort.[85] Unfortunately, a common shorthand refers to the claim as one for "tortious interference." That has led the defendants in many cases, including this one, to argue that the claim requires independently tortious conduct. That is erroneous.

The *Restatement (Second) of Torts* explains this point at length. Like other intentional torts—think battery or trespass—the tortious nature of the conduct results from *intentional* and *unjustified* harm. Striving for a single term that would capture both concepts, the *Restatement* proffers "improper."[86] A plaintiff who satisfies

---

[85] Restatement (Second) of Torts, *supra*, Div. Nine, Chapter 37 Intro. Note ("The tort of interference with existing or prospective contractual relations, covered in this Chapter, is an intentional tort.").

[86] *Id.* ("The word adopted for use in this Chapter, neutral enough to acquire a specialized meaning of its own for the purposes of the Chapter, is 'improper.' The several forms of the intentional tort of interference with a contractual relation are set out in §§ 766, 766A and 766B. Each of them provides that the interference must be improper. Section 767 specifies and analyzes the factors to be taken into consideration in determining whether the interference is improper, and must therefore be read and applied to each of the earlier sections. The determination of

the elements of a claim for intentional interference has pled a tort. Pleading the

requisite elements requires allegations of *improper* conduct, which is different from

conduct that is tortious in its own right.[87] Virtually all tortious conduct amounts to

improper conduct, but some improper conduct is not independently tortious.[88]

Rather than "tortious interference," the *Restatement* uses the term

"Intentional Interference with Prospective Contractual Relation."[89] The black-letter

law states:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of:

---

whether an interference is improper depends upon a comparative appraisal of these factors. And the decision is, whether it was improper under the circumstances—that is under the particular facts of the individual case, not in terms of rules of law or generalizations. Sections 768–773 state specific applications of the factors set out in § 767 to certain types of factual patterns.").

[87] *See Malawi v. PHI Serv. Co.*, 2012 WL 986751, at *3 (Del. Com. Pl. Feb. 22, 2012) ("The term 'wrongful act' is not strictly limited to illegal activities but can include morally wrong acts that are not criminal or tortious.").

[88] Restatement (Second) of Torts, *supra*, § 766B cmt. d (explaining the factors to consider in determining whether an interference is improper: "One of them is the actor's motive and another is the interest sought to be advanced by him. Together these factors mean that the actor's purpose is of substantial significance. If he had no desire to effectuate the interference by his action but knew that it would be a mere incidental result of conduct he was engaging in for another purpose, the interference may be found to be not improper. Other factors come into play here, however, particularly the nature of the actor's conduct. If the means used is innately wrongful, predatory in character, a purpose to produce the interference may not be necessary. On the other hand, if the sole purpose of the actor is to vent his ill will, the interference may be improper although the means are less blameworthy.").

[89] *Id.* § 766B.

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.[90]

The commentary states: "In order for the actor to be held liable, this Section requires that his interference be improper. The factors of importance in determining this issue are stated and explained in § 767, which must be read closely with this Section."[91]

Section 767 identifies seven factors to consider when evaluating whether the intentional interference is improper; none require that the conduct be independently tortious. The blackletter law states:

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

---

[90] *Id.*

[91] *Id.* cmt. a.; *accord id.* cmt. d ("The interference, however, must also be improper. The factors to be considered in determining whether an interference is improper are stated in § 767.").

(g) the relations between the parties.[92]

The commentary explains that the factors are "to be taken into consideration in determining whether the interference is improper or not, through an appraisal of the several factors and an evaluation of their comparative weight."[93]

Later commentary emphasizes that "[t]he natures of the actor's conduct is the chief factor in determining whether the conduct is improper or not, despite its harm to the other person."[94] Distinguishing between tortious and non-tortious means, the comment explains:

> Some of them, like fraud and physical violence, are tortious to the person immediately affected by them; others, like persuasion and offers of benefits, are not tortious to him. Under the same circumstances interference by some means is not improper while interference by other means is improper; and, likewise, the same means may be permissible under some circumstances while wrongful in others. The issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it in the manner in which he does cause it. The propriety of the means is not, however, determined as a separate issue unrelated to the other factors. On the contrary, the propriety is determined in the light of all the factors present. Thus physical violence, fraudulent misrepresentation and threats of illegal conduct are ordinarily wrongful means and subject their user to liability even though he is free to accomplish the same result by more suitable means . . . . Yet even these means are not always forbidden . . . . For example, C operates a gambling den in the rear room of his ice cream parlor. B's parent, A, having the privilege of corporal punishment, may exercise that privilege in order to cause B not to patronize C's ice cream parlor . . . . The nature of the means is, however, only one factor in determining whether the interference is improper. Under some

---

[92] *Id.* § 767.

[93] *Id.* cmt. a.

[94] *Id.* cmt. c.

circumstances the interference is improper even though innocent means are employed.[95]

Again, independently tortious conduct is not required.

But there is a complication. The *Restatement* includes a special version of the general test that applies when a party with a financial interest in a business induces the business not to contract. The blackletter law states:

> One who, having a financial interest in the business of a third person intentionally causes that person not to enter into a prospective contractual relation with another, does not interfere improperly with the other's relation if he

> (a) does not employ wrongful means and

> (b) acts to protect his interest from being prejudiced by the relation.[96]

That section notably uses the term "wrongful means" rather than "improper conduct." The "wrongful means" can be tortious, such as "conduct in abuse of a fiduciary relationship."[97] The wrongful means can also be wrongful under the circumstances.

---

[95] *Id.*

[96] *Id.* § 769.

[97] *Id.* cmt. d. The comment also notes that "[t]he predatory means discussed in § 767, Comment c, are usually tortious to the person directly affected by them, and wrongful under the rule stated in this Section." *Id.* Section 767, comment c explains that fraudulent misrepresentations are "ordinarily a wrongful means of interference and make an interference improper." *Id.* § 767 cmt. c. "Conduct specifically in violation of statutory provisions or contrary to established public policy may for that reason make an interference improper." *Id.* So too are civil suits "if the actor has no belief in the merits of the litigation or if, though having some belief in its merit, he nevertheless institutes or threatens to institute it in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication." *Id.*

Delaware cases have reduced the *Restatement*'s fact-specific approach into four elements of a claim. They are (1) the reasonable probability of a business opportunity; (2) intentional interference with that opportunity; (3) proximate causation; and (4) damages.[98] To better harmonize with the *Restatement* test, the second element should be intentional *and improper* interference with that opportunity.

Delaware currently gets to the same place through the back door by weighing the defendant's intentional interference against "a defendant's privilege to compete or protect his business interests in a fair and lawful manner."[99] That is a way of asking whether the defendant's intentional interference was proper. The difference in approach "bears on the issues of whose responsibility it is to raise the question of culpability or justification—that is, whether the interference was improper or not— in the pleadings and who has the burden of proof in the sense of the risk of nonpersuasion."[100] Following the *Restatement* in framing the pleading requirement means that a plaintiff must plead conduct that is intentional and improper, rather than only having to plead conduct that is intentional and forcing the defendant to

[98] *Malpiede*, 780 A.2d at 1099.

[99] *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *5 (Del. Ch. Jan. 20, 2009).

[100] Restatement (Second) of Torts, *supra*, § 767.

assert justification or privilege as a defense.[101] Delaware law could simplify matters by using the *Restatement*'s concept of "improper conduct."

The complaint pleads that Porsche intentionally interfered with the VC Financing and PE Financing by having Knörle drag his feet and then fail to approve them. It is undisputed that Porsche has a financial interest in the Company, but the complaint pleads that Porsche acted through wrongful means—by causing Knörle to breach his duty of loyalty. The *Restatement* identifies a breach of duty as an example of wrongful conduct.

---

[101] For tortious interference with contract, Delaware expressly requires that a plaintiff plead lack of justification, with courts analyzing the so-called "affiliate privilege" as part of that element. *E.g.*, *McCann v. CP Direct LLC*, 2026 WL 401174, at *3 (Del. Super. Feb. 12, 2026) (identifying "without justification" as an element of a claim for tortious interference with contract); *Institutional Processing Servs. LLC v. Realtime Sols., LLC*, 2026 WL 36482, at *4 (Del. Super. Jan. 6, 2026) (same); *Moran v. Zoomcar India Priv. Ltd.*, 2025 WL 3243428, at *14 (Del. Super. Nov. 20, 2025) (same; using "without justification" element to analyze the "affiliate privilege"). Delaware law could simplify matters here by requiring a plaintiff to plead (1) a contract, (2) known to the defendant, and (3) an intentional and improper act that is a significant factor in causing breach, and (4) resulting injury. The current formulation introduces "without justification" as a fourth element before resulting injury. A little digging traces that formulation to an unreported decision in 1984 that applied New York law. *See Pennzoil Co. v. Getty Oil Co.*, 1984 WL 15664, at *18 (Del. Ch. Feb. 6, 1984). Chancellor Allen paraphrased that formulation in *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987). Citations to that aspect of *Irwin & Leighton* abound, with Westlaw identifying seventy-one Delaware cases. Notably, however, Chancellor Allen cited and discussed Sections 766 and 767 of the *Restatement (Second) of Torts* in *Irwin & Leighton*, so even under the line of authority that descends from that decision, the *Restatement*'s principles should control the analysis. Dropping the separate pleading requirement of justification and focusing on improper conduct would bring Delaware law into harmony with that authoritative source.

Porsche argues that it did not act wrongfully because the Investor Agreement identified transactions that required Knörle's approval, and the VC Financing and PE Financing qualified. If Knörle had not inferably breached his fiduciary duty by blocking the transactions, then that argument might prevail. But here, the complaint pleads that Knörle breached his duty of loyalty.

Count III survives pleading-stage review.

## D.    Count IV: Implied Covenant Of Good Faith And Fair Dealing

The complaint's last claim asserts that Porsche breached the implied covenant of good faith and fair dealing inherent in the Investor Agreement by instructing Knörle to block the VC Financing and the PE Financing.[102] Porsche argues that the Investor Agreement expressly contemplated transactional vetoes so there is no gap for the implied covenant to fill. To the contrary, that structure simply falls within the variant of the implied covenant that applies when one party to a contract can exercise discretion. The complaint sufficiently alleges that Porsche breached the implied covenant when wielding its discretionary right.

As a matter of black-letter law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."[103] Delaware likewise recognizes that an implied covenant of good faith and fair dealing

---

[102] Porsche Investments is the counterparty under the Investment Agreement, so references to Porsche for purposes of this count mean Porsche Investments.

[103] Restatement (Second) of Contracts § 205 (A.L.I. 1981), Westlaw (database updated Oct. 2024).

"attaches to every contract."[104] The Delaware Supreme Court has summarized the

implied covenant concisely as follows:

> The implied covenant is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that . . . neither party anticipated. It applies when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. The reasonable expectations of the contracting parties are assessed at the time of contracting.[105]

While the Delaware Supreme Court has not provided extensive guidance on

what "good faith" and "fair dealing" mean, an implied covenant claim is

contractual.[106] That means those terms are contractual concepts. When used with the

implied covenant, the term "good faith" does not "envision loyalty to the contractual

counterparty, but rather faithfulness to the scope, purpose, and terms of the parties'

contract."[107] The concept of "fair dealing" similarly refers to "a commitment to deal

'fairly' in the sense of consistently with the terms of the parties' agreement and its

purpose."[108]

---

[104] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).

[105] *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (internal quotation marks omitted).

[106] *Rossdeutscher v. Viacom, Inc.*, 768 A.2d 8, 20 (Del. 2001) ("A breach of the implied covenant is a breach of contract.").

[107] *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 419 (Del. 2013) (emphasis omitted).

[108] *Id.*

When analyzing an implied covenant claim, a reviewing court does not introduce its own notions of what is "fair or reasonable under the circumstances."[109] The application of "good faith" and "fair dealing" turns "on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally."[110]

The Delaware Supreme Court has recognized that the implied covenant can apply in two settings: (1) when a party invokes the covenant to imply an omitted right or obligation, and (2) when a party invokes the covenant to constrain a counterparty's exercise of contractual discretion.[111] In the first setting, a court determines whether there is a gap in the contract, whether the gap should be filled, and if so, what term the parties would have agreed to if the issue had arisen at the bargaining table.[112] In the second setting, the discretionary right simplifies the inquiry because it gives rise to the gap. The court need only determine whether the party exercised its

---

[109] *El Paso Pipeline,* 113 A.3d at 184.

[110] *Id.* (emphasis omitted) (internal quotation marks omitted).

[111] *See Johnson & Johnson v. Fortis Advisors LLC,* — A.3d —, 2026 WL 89452, at *16 (Del. Jan. 12, 2026) (explaining the "two primary ways" that the implied covenant operates).

[112] *See Calumet Cap. P'rs LLC v. Victory Park Cap. Advisors, LLC*, 353 A.3d 88, 123–26 (Del. Ch. 2026).

discretionary right "reasonably," meaning consistent with the parties' expectations at the time of contracting.[113]

When seeking to ascertain what parties would have agreed to when bargaining originally, the analysis recognizes that contract parties join in a cooperative enterprise to create a joint surplus.[114] In other words, parties to a contract are not

---

[113]*Gerber*, 67 A.3d at 418 (citing *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440–42 (Del. Ch. 2012), *aff'd in part, rev'd in part on other grounds*, 68 A.3d 665 (Del. 2013)); *see also Calumet*, 353 A.3d at 127 ("The principles that govern the implied covenant teach that the exercise of discretionary authority must fall within the range of possibilities that the parties would have agreed to during their original negotiations, if they had thought to address the issue."); *see also Johnson & Johnson*, 2026 WL 89452, at *16 ("When the party exploits that discretion in a manner that defeats the 'overarching purpose' of the bargain, courts may imply a requirement that such discretion be exercised reasonably and in good faith to ensure that the discretionary power is applied consistently with what reasonable parties would have agreed to at signing."). This temporal limit ensures that the implied covenant is not invoked to "establish a free-floating requirement that a party act in some morally commendable sense." *El Paso Pipeline*, 113 A.3d at 182–83.

[114] *See Contrarian Funds L.L.C. v. Westpoint Int'l, Inc.*, C.A. No. 2617-CC, at 6 (Del. Ch. Nov. 3, 2010) (TRANSCRIPT) ("[C]ontracts are entered into for the benefit of all parties to the contract."), *aff'd*, 26 A.3d 213 (Del. 2011); *see also* Restatement (Second) of Contracts, *supra*, § 205 cmt. a ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . ."); 1 Williston On Contracts, *supra*, § 1:1 ("Contract law is designed to protect the expectations of the contracting parties. It is intended to enforce the expectancy interests created by the parties' promises so that they can allocate risks and costs during their bargaining. The goal of contract law is to hold parties to their agreements so that they receive the benefits of their bargains."); 17A Am. Jur. 2d Contracts § 362, Westlaw (database updated May 2026) (under the implied covenant of good faith and fair dealing, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract"). *See generally* Alan Schwartz & Robert E. Scott, *Contract Theory and the Limits of Contract Law*, 113 Yale L.J. 541, 552–54 (2003) ("Bargaining power . . . is exercised in the division of the surplus . . . . Parties jointly choose the contract terms so as to maximize the surplus . . . .").

fiduciaries for each other and are therefore free to act in their own interests, but they have nonetheless committed themselves to act together in a joint effort.[115]

With this agreed common purpose in mind, "a party in the original bargaining position would expect that the counterparty would not use a discretionary right to destroy the contractual relationship maliciously and without any justification rationally related to the shared contractual purpose."[116] The idea that Porsche could shut down the Company for its own purposes by strategically delaying advances under the Porsche Note, wielding its director veto right to block third-party financing that the Company desperately needed, and inducing the Company to give up confidential information with false promises of a bridge loan is so far from any concept of shared contractual purpose that it raises an inference of malice. If an officious bystander had been observing the negotiations and piped up with the suggestion that the parties needed to expressly prohibit that course of conduct, the parties would have responded with a common "Of course not! No one would think Porsche could do

---

[115] *ArchKey Intermediate Hldgs. Inc. v. Mona*, 302 A.3d 975, 1005 (Del. Ch. 2023); *see Libeau v. Fox*, 880 A.2d 1049, 1056–57 (Del. Ch. 2005) (alluding to the "wealth-creating and peace-inducing effects of civil contracts"), *aff'd in part, rev'd in part on other grounds*, 892 A.2d 1068 (Del. 2006). *See* Schwartz & Scott, *supra*, at 544 ("[C]ontract law should facilitate the efforts of contracting parties to maximize the joint gains (the 'contractual surplus') from transactions."); Gerrit De Geest, *N Problems Require N Instruments*, 35 Int'l Rev. L. & Econ. 42, 46 (2013) ("[T]he fundamental goal of contract law [is] to maximize the joint surplus of the parties . . . ."); Jeffrey L. Harrison, *A Case for Loss Sharing*, 56 S. Cal. L. Rev. 573, 594 (1983) ("Partnership law and contract law are both designed to foster the sharing of a jointly created surplus.").

[116] *Calumet*, 353 A.3d at 131.

that!"[117] Some understandings are so foundational that it would be offensive to suggest during a negotiation that the counterparty should be expressly prohibited from violating them.

It therefore is reasonably conceivable that Porsche breached the implied covenant of good faith and fair dealing by exercising its veto right maliciously and without any justification rationally grounded in the contractual relationship.[118] Porsche could have used its veto right for various rational purposes. For example, if Porsche thought that the VC Financing or PE Financing were too expensive, harmful to the Company, or even harmful to its own interests, then Porsche could have prevented the Company from proceeding without facing a claim under the implied covenant.[119]

---

[117] *See Guilbeau v. Footprint Int'l Holdco, Inc.*, 2026 WL 1180159, at *14 (Del. Ch. Apr. 30, 2026) (discussing the officious bystander test).

[118] For purposes of this claim, Knörle's exercise of the veto right can be imputed to Porsche under principles of agency. *Thornton*, 2024 WL 326665, at *4; *see also Mechell v. Palmer*, 343 A.2d 620, 621 (Del. 1975) ("One who delegates power to act is responsible for what is done pursuant to that authority.").

[119] *Calumet*, 353 A.3d at 131 ("A party obviously can wield a discretionary right to promote contractual goals and create joint surplus. Just as obviously, a party can wield a discretionary contractual right to protect its own interests.").

What Porsche could not do was use its veto right for the sole purpose of harming the Company.[120] The complaint alleges facts supporting an inference that Porsche did that.

The complaint alleges that Porsche intentionally destroyed the Company to keep its competitors from accessing promising technology: When presented with pressing requests to approve financings, Knörle repeatedly delayed, citing his need to confer with Porsche, which prevented the Board from acting. Porsche then delayed matters further by either postponing its internal meetings with Knörle or refusing to give Knörle instructions, before blocking the Company from obtaining the financing it needed. The complaint also alleges that Porsche separately reneged on its own promises of financing. Ultimately, Porsche's actions rendered the Company insolvent.

Taken together, the complaint's allegations support the inference that Porsche acted maliciously to harm the Company, without any rational purpose grounded in the contract. Those allegations state a claim for breach of the implied covenant of good faith and fair dealing.

## E.     Exculpation Under The Voting Agreement

Porsche next raises a defense of contractual exculpation. Section 1.5 of the Voting Agreement grants Porsche a degree of exculpation (the "Exculpation

---

[120] *Id.* ("[A] party cannot wield a discretionary contractual right like a mafia gangster by using it to inflict harm on the counterparty unless the counterparty does what it wants.").

Provision"). Porsche's pleading-stage invocation of the Exculpation Provision cannot support dismissal.

Whether the Exculpation Provision protects Porsche presents an issue of contract interpretation. When interpreting contracts, the court's role is to fulfill the "parties' shared expectations at the time they contracted."[121] "When the contract is clear and unambiguous, [the court] will give effect to the plain-meaning of the contract's terms and provisions unless it appears the parties intended a special meaning."[122] If language in a contract is ambiguous, the court may consider extrinsic evidence to interpret the term or provision as it would be understood by an objective, reasonable third party.[123] "Language is ambiguous if it is susceptible to more than one reasonable interpretation."[124] "The parties' steadfast disagreement over the interpretation of disputed language will not, alone, render the contract ambiguous."[125]

---

[121] *Exelon Generation Acqs., LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017).

[122] *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[123] *Hill v. LW Buyer, LLC*, 2019 WL 3492165, at *6 (Del. Ch. July 31, 2019) (explaining that "Delaware adheres to an objective theory of contracts, and so the contract's construction should be that which would be understood by an objective, reasonable third party" (cleaned up)).

[124] *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021).

[125] *Id.*

When ruling on Rule 12(b)(6) motion, a court cannot resolve contractual ambiguity.[126] Dismissal is proper "only if the defendants' interpretation is the only reasonable construction as a matter of law." [127] "If the Plaintiff has offered a reasonable construction of the contract, and that construction supports the claims asserted in the complaint, then the Court must deny the motion to dismiss even if the defendant's construction is also reasonable."[128]

The Exculpation Provision states:

> <u>No Liability for Election of Recommended Directors.</u> No Stockholder, nor any Affiliate of any Stockholder, shall have any liability as a result of designating a person for election as a director for any act or omission by such designated person in his or her capacity as a director of the Company, nor shall any Stockholder have any liability as a result of voting for any such designee in accordance with the provisions of this Agreement.[129]

---

[126] *LGM Hldgs., LLC v. Schurder*, 340 A.3d 1134, 1143 (Del. 2025) ("When interpreting a contract on a motion to dismiss, "the trial court cannot choose between two differing reasonable interpretations of ambiguous provisions."); *accord Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) ("On a motion to dismiss for failure to state a claim, a trial court cannot choose between two differing reasonable interpretations of ambiguous documents.").

[127] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003); *accord Caspian*, 93 A.3d at 1205 (same).

[128] *Cont'l Auto. Sys., Inc. v. Nokia Corp.*, 2023 WL 1370523, at *19 (Del. Ch. Jan. 31, 2023); *accord Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744 (Del. Ch. June 11, 2020) ("If the plaintiff has proffered a reasonable construction that supports its allegations of breach, dismissal must be denied.").

[129] VA § 1.5.

Porsche contends that the Exculpation Provision offers two levels of protection that oddly appear in reverse chronological order. Porsche first asserts that the second half of the provision—"as a result of voting for any such designee"—means Porsche cannot be held liable for making Knörle a director (the "Election Clause"). Porsche asserts that the first half of the provision—"as a result of designating a person for election as a director for any act or omission by such designated person in his or her capacity as a director"—means Porsche cannot be held liable for any claims premised on Knörle's acts or omissions in his capacity as the Porsche Director (the "Action Clause"). The Company responds that both clauses only relate to the act of placing the Porsche Director on the Board, with the first part of the provision covering "designating" the Porsche Director and the second part of the provision covering "voting for" the Porsche Director. The Company also notes that the caption of the provision, while not dispositive, supports its interpretation.

The Exculpation Clause is difficult to parse. As both sides contend, it facially consists of two clauses. Moreover, the Election Clause does seem to address the election of the Porsche Director. The problem lies with the Action Clause. If it only referred to "any act or omission by such designated person in his or her capacity as a director of the Company," then the plain language would support Porsche's reading. Better yet, if the two parts were flipped, it might well mean what Porsche wants. The redrafted clause would state:

> No Liability for ~~Election of Recommended~~ Directors. No Stockholder, nor any Affiliate of any Stockholder, shall have any liability as a result of designating <u>or voting for</u> a person for election as a director <u>or</u> for any act or omission by such designated person in his or her capacity as a director

of the Company~~, nor shall any Stockholder have any liability as a result of voting for any such designee in accordance with the provisions of this Agreement~~.

But the Exculpation Provision does not say that. The Action Clause speaks in terms of no liability "as a result of designating a person for election as director," then elides into the concept of acts or omissions by the designated person.

Both sides have advanced reasonable readings of a poorly drafted provision. The Exculpation Provision therefore cannot support a pleading-stage dismissal.

The Exculpation Provision also cannot support a pleading-stage dismissal because even if Porsche's reading were correct, Delaware law does not permit parties to eliminate liability for intentional and bad faith acts.[130] The claims here charge Porsche with intentional and bad faith acts. Even if the Exculpation Provision sweeps as broadly as Porsche hopes, it cannot protect Porsche against those claims.

---

[130] *See J. A. Jones Const. Co. v. City of Dover*, 372 A.2d 540, 545 (Del. Super. 1977) ("A party may not protect itself against liability for its own fraudulent act or bad faith. Even if a contract purports to give a general exoneration from 'damages,' it will not protect a party from a claim involving its own fraud or bad faith." (citation omitted)); *accord Fort Howard Cup Corp. v. Quality Kitchen Corp.*, 1992 WL 207276, at *5 (Del. Super. Aug. 17, 1992); *see also Data Mgmt. Int'l, Inc. v. Saraga*, 2007 WL 2142848, at *5 (Del. Super. July 25, 2007) (contract between sophisticated parties can only exculpate for negligence); Restatement (Second) of Contracts, *supra*, § 195 ("A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy."); 8 Williston on Contracts § 19:24 (4th ed. 2023), Westlaw (database updated May 2026) ("An attempted exemption from liability for a future intentional tort . . . is generally held void . . . ."). *See generally New Enter. Assoc. 14, L.P. v. Rich* (*NEA II*), 295 A.3d 520 (Del. Ch. 2023) (discussing limitations on covenants not to sue).

Porsche responds by pointing to the new Section 122(18) adopted by the Delaware General Assembly in 2024 (the "Governance Agreement Amendment").[131] The Governance Agreement Amendment authorizes a corporation to "covenant that [it] . . . will take, or refrain from taking, future actions specified in the contract."[132] According to Porsche, the Company validly covenanted to refrain from taking any action to seek to impose liability on Porsche for the conduct described in the Exculpation Provision.

The Governance Agreement Amendment does not authorize contract provisions that "would be contrary to the laws of this State . . . if included in the certificate of incorporation."[133] A provision is "contrary to the laws of this State" if it "'transgress[es] a statutory enactment or a public policy settled by the common law or implicit in the General Corporation itself.'"[134] Here, Porsche's reading would cause the Exculpation Provision to violate Delaware's settled common-law prohibition against eliminating liability for intentional and bad faith acts. A charter provision

---

[131] *See* 84 Del. Laws Ch. 309 (2024), *codified at* 8 *Del. C.* § 122(18); 2024 Reg. Sess. S.B. 313.

[132] *See* 8 *Del. C.* § 122(18)(c).

[133] *See id.* § 122(18).

[134] *Jones Apparel Gp., Inc. v. Maxwell Shoe Co., Inc.*, 883 A.2d 837, 843 (Del. Ch. 2004) (quoting *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 118 (Del. 1952)). In this context, "transgresses" means "vitiates or contravenes . . . a mandatory rule of our corporate code or common law." *Id.* at 846.

that attempted to do that would be "contrary to the laws of this State." The Exculpation Provision therefore again cannot support a pleading-stage dismissal.

Trying once more, Porsche argues that any challenge to the scope of the Exculpation Provision comes too late. Citing *Moelis*,[135] Porsche argues that the Company has advanced a facial challenge to the Exculpation Provision, that the provision is voidable rather than void, and that any cause of action accrued on September 17, 2020. At this point, according to Porsche, the three-year statute of limitations has run.

There are two responses to that argument. First, because Delaware law simply does not authorize the elimination of liability for intentional or bad faith acts, then the Exculpation Provision is truly void, not voidable. Second, unlike in *Moelis*, the Company is not mounting a facial challenge. In *Moelis*, the justices made clear that its ruling on timeliness left open the assertion of "as-applied claims . . . based on specific circumstances that may arise in the future, challenging the enforceability of the [provision] in those circumstances."[136] The Company does not argue that the Exculpation Provision is facially invalid. The Company argues that the Exculpation Provision cannot be applied to exculpate Porsche on these facts.

For now, what matters is that the Exculpation Provision cannot support a pleading-stage dismissal.

---

[135] *Moelis & Co. v. W. Palm Beach Firefighters' Pens. Fund* (*Moelis II*), — A.3d —, 2026 WL 184868, at *17 (Del. Jan. 20, 2026).

[136] *Id.*

**F.    Laches**

Finally, the defendants argue that the Company's claims based on the VC Financing are time-barred. The court cannot resolve that defense on the pleadings.

"Laches is an equitable defense born from the longstanding maxim [that] equity aids the vigilant, not those who slumber on their rights."[137] The doctrine "protects defendants from prejudice by prohibiting the unreasonably slow filing of equitable claims."[138] When considering a Rule 12(b)(6) motion, the court is generally limited to the allegations in the pleadings, and "affirmative defenses, such as laches, are not ordinarily well-suited for treatment on such a motion. Unless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it, dismissal of the complaint based upon an affirmative defense is inappropriate."[139]

"[L]aches generally requires proof of three elements: first, knowledge by the claimant; second, unreasonable delay in bringing the claim; and third, resulting prejudice to the defendant."[140] A lawsuit commenced within the analogous statutory

---

[137] *Kim v. Coupang, LLC*, 2021 WL 3671136, at *3 (Del. Ch. Aug. 19, 2021).

[138] *Hall v. Mundy*, 2025 WL 48157, at *5 (Del. Ch. Jan. 8, 2025) (citing *Quill v. Malizia*, 2005 WL 578975, at *14 (Del. Ch. Mar. 4, 2005)), *aff'd sub nom. Williams v. Hall*, 2026 WL 35922 (Del. Jan. 6, 2026).

[139] *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009) (citations omitted).

[140] *Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 7 (Del. 2009).

period is presumptively timely.[141] "The statute of limitations begins to run at the time that the cause of action accrues"[142] not "when the effects of the act are felt."[143] Here, it is undisputed that the relevant statute of limitations period is three years.[144]

Delaware courts have developed three approaches for identifying when a claim has accrued: the discrete act method, the continuing wrong method, and the separate accrual method.[145] The discrete act method is the most favorable to Porsche, and even under that method, the Company's claims are presumptively timely.

The discrete act method applies when "a claim arises at a distinct point in time and is effectively complete as of that date, even if it has ongoing implications."[146] Under the discrete act method, claims based on the VC Financing accrued on April 12, 2022, when Knörle told Sobhany he would not approve the deal. The Company filed this case in March 2025, within the statute of limitations period. That is

---

[141] *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 769–70 (Del. 2013).

[142] *Lebanon Cnty. Emps. Ret. Fund v. Collis*, 287 A.3d 1160, 1195 (Del. Ch. 2022) (citation omitted).

[143] *Winklevoss Cap. Fund, LLC v. Shaw*, 2019 WL 994534, at *5 (Del. Ch. Mar. 1, 2019).

[144] *See* 10 *Del. C.* § 3106.

[145] *Buddenhagen v. Clifford*, 2024 WL 2106606, at *21 (Del. Ch. May 10, 2024).

[146] *W. Palm Beach Firefighters' Pens. Fund v. Moelis & Co.* (*Moelis I*), 310 A.3d 985, 994 (Del. Ch. 2024), *rev'd on other grounds*, 2026 WL 184868, at *17 (Del. Jan. 20, 2026).

presumptively timely for purposes of laches. That defense therefore cannot support a pleading-stage dismissal.

### III.    CONCLUSION

The complaint states claims on which relief can be granted. The Rule 12(b)(6) motions are denied.